UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

PETER GAFF, as Administrator of the
Estate of Michael K. Maldonado, and
JESSICA MALDONADO,

Plaintiffs,

CASE NO. 2:06-CV-00068-WCO

v.

BAJA MARINE CORPORATION and
BRUNSWICK CORPORATION,
Defendants.
_____/

## PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO
## EXCLUDE THE EXPERT TESTIMONY OF PETER MERTHER, P.E.

Pursuant to Local Rule 7.1B, Plaintiffs Peter Graff, as administrator of the estate of Michael K. Maldonado, and Jessica Maldonado, respond in opposition to Defendants' Motion to Exclude the Expert Testimony of Peter Merther and the Memorandum of Law in Support Defendants' Motion to Exclude the Expert Testimony of Peter Merther ("Defendants' Merther Motion and Memorandum") as follows:

### I. Introduction

Defendants have unfairly launched a side-door assault on the results of the tensile bar test in this matter by attacking the testimony of laboratory technician Peter Merther. Apparently recognizing the devastating nature of the tensile bar results, which confirm the opinions of Plaintiffs' metallurgist,

1

1378858.1

Brian Rampolla, Defendants have elicited opinions and supposed "admissions" from a technician who was never tendered as an expert in the analysis of tensile testing, a subject matter that this technician was unprepared and unqualified to address at his deposition. Rather than take on Plaintiffs' metallurgical expert, Rampolla, directly, regarding the subject matter for which he has expertise, Defendants attempt to convince this Court that Technician Merther is in a position to usurp a metallurgist's role of reviewing, analyzing, and rendering an opinion on the validity of the tensile bar test results in this case.

Plaintiffs' counsel have consistently made clear both to defense counsel and this Court that Technician Merther was identified only to report the results of the tensile test.[1] Plaintiffs are not even certain that such technicians fall under *Daubert*, or an evaluation of expert testimony. Nevertheless, in an abundance of caution, and to avoid a hearsay objection at trial, Plaintiffs identified Merther and other technicians consistent with the expert disclosure requirements, with the idea that they would be subject to examination regarding the

---

[1]  See Exhibit "1", Plaintiffs' Response to Defendants' Motion for Entry of Expert Scheduling Order and Memorandum of Law in Support of Motion for Enlargement of Time, p.11 note 26, and Exhibit "B" thereto, which is an e-mail dated February 22, 2007 from Fredric Zinober to Doug Scribner, at 5:25 PM.

2

manner that they conducted the tests and the results that they obtained. They never have been, nor could they be, tendered for the purpose to evaluate and offer opinions on the validity of the tensile bar test, which is within the parameters of a metallurgist. Certainly, had Plaintiffs sought to tender Technician Merther for that purpose, the Defendants would be complaining that he is not qualified under *Daubert* to render such opinion.

To the extent that Technician Merther is subject to a *Daubert* evaluation, he is well qualified to conduct the type of tensile bar testing that he has conducted over 500 times, using the same methodology that is widely accepted among testing laboratories. The results of the test, when evaluated and explained by Plaintiffs' metallurgist, will assist the jury in understanding the issues to be adjudicated at trial. Thus, the testimony of Merther should be admitted for the limited purpose for which it has been tendered.

## II. Brief facts

On the early evening of May 16, 2004, Michael Maldonado and his friend, Brian Ruggerio, were traveling together on the calm, flat waters of Lake Lanier, Gainesville, Georgia, near Brown's Bridge. Ruggerio, who had a faster boat than Maldonado's 25' Baja Outlaw, with Mercury engines and outdrives, sped ahead of

3

Maldonado, looked back, saw Maldonado give a casual wave, and traveled ahead.    Later, Maldonado's vessel was found in the water, listing to the rear.    Maldonado was never found, but physical evidence from inside and just outside the vessel, along with damage to the vessel itself, demonstrates, conclusively, that Maldonado was thrown from the boat and drowned.

When the boat was removed from the water, it was apparent that the transom assembly had broken.    Plaintiffs initially believed that the gimbal ring had broken first, followed by the gimbal housing (both are parts of the transom assembly).    Brian Rampolla ("Rampolla"), a Senior Metallurgical Engineer/ Program Manager with Alion Science & Technologies, Inc., a large marine architecture and scientific company, was engaged to evaluate the metal.    In connection with his assignment, Rampolla conducted (or had conducted under his supervision) numerous standard tests routinely performed by metallurgists specializing in failure analysis,[2] including a visual examination, a radiographic examination, examination through a scanning electron microscope, a hardness test, a chemical analysis, and a review of relevant literature.[3]

---

[2] See deposition of Michael Stevenson ("Stevenson depo") at p. 70 to p. 75.

[3] See Amended Final Report of Brian Rampolla ("Rampolla Report").

Additionally, one of the traditional tests administered in such a review is a tensile bar test. Rampolla engaged, through MATCO Associates, the Non-Destructive Testing Group, Inc ("NDTG") testing laboratory. Rampolla, who would ultimately review and analyze the test results, determined the location of the tensile bars, and requested that the largest size tensile bar possible be used at the determined location.[4] However, if .25 inch bars could not be generated from the broken metal, Rampolla requested that .16 inch bars be utilized.[5] Rampolla recognized the limitations on using the smaller bars, but determined that the test could be conducted in a manner properly reflective of the condition of the metal. Merther conducted the tests, and reported the results to Rampolla, who analyzed the results, and concluded that these tests were properly administered and confirmed his evaluation of the housing's fracture surface.

### III.  Legal Analysis

### A.  *Daubert* Does Not Apply To Merther's Testimony

The test established by the Supreme Court in *Daubert* does not apply to Merther's testimony because he is not offering any opinion testimony. Rather, Merther's testimony at trial will be

---

[4] See Rampolla's Notes, Exhibit "2".
[5] *Id.*

limited to the factual steps he took in performing the tensile bar tests. If a witness does not offer any opinion testimony, then his testimony is not subject to review under *Daubert*. *See Binakonsky v. Ford Motor Co.*, 133 F.3d 281, 290 (4th Cir. 1998); *Phillips v. American Honda Motor Co., Inc.*, 438 F.Supp.2d 1328, 1332 (S.D.Ala. 2006); *Atkinson v. State Farm Ins. Co.*, No. 3-02-cv-2596-M, 2004 WL 187309, * 1 (N.D.Tex. Jan. 7, 2004); *Nebraska v. Robinson*, 724 N.W.2d 35, 68 (Neb. 2006). Technician Mether's testimony is based on the physical steps he took in performing the tensile tests and information be forwarded to Rampolla, not on his opinion as to the validity of the results.

In *Gilbert v. Monaco Coach Corp.*, 352 F.Supp.2d 1336, 1340-41 (N.D.Ga. 2004), this Court held that a witness who does not offer any opinion is not subject to a *Daubert* analysis. *Gilbert* involved a breach of warranty action resulting from an allegedly defective recreational vehicle ("RV"). *Id.* at 1337-38. Plaintiffs offered the testimony of an expert who confirmed through "a test drive and a visual and sensory inspection" that the RV did suffer from the problems plaintiffs alleged. *Id.* at. 1341. The defendant moved to exclude the expert's testimony under *Daubert*. *Id.* at 1339. The Court denied the defendant's motion on the grounds that, even though the witness may be an

6

expert in automotive mechanics, he was not offering an expert "opinion" as to the cause of the RV's problems. *Id.* at 1340.

Like in *Gilbert*, Technician Merther will only testify about the tensile tests that he physically performed. Specifically, Merther will testify that he took the machined tensile specimens, measured the dimensions of each specimen, and then punch marked each specimen in order to measure elongation.[6] Merther then loaded each specimen into the universal testing machine and applied a slight pre-load to the specimen. Next, he inputted the dimensions of the specimen into the computer that controls the test and applied an extensometer to the specimen for the purpose of measuring yield load. Once the extensometer was zeroed, Merther activated the computer which controls the tensile test. The specimen was then pulled until a yield was obtained, at which time Merther removed the extensometer. However, two of the specimens fractured before a yield load could be obtained. For the remaining two specimens, after the extensometer was removed, they were pulled until they fractured. Following the fracture of the specimens, the specimens were placed back together in order to measure elongation and reduction of area. Merther then removed the specimens from the universal testing machine. The computer then generated the

─────────────────

[6] See Affidavit of Peter Merther ("Merther Affidavit"), paragraph 12.

1378858.1

results which Merther provided to Rampolla.[7] At no point will Merther offer any opinion whatsoever.

**B.    Plaintiffs Identified Merther as an Expert Out of An Abundance of Caution**

Plaintiffs only identified Merther as an expert witness in order to avoid a potential hearsay objection at trial.  Federal Rule of Evidence 703 allows expert witnesses to base their opinion on facts or data "of a type reasonably relied upon by experts in the particular field . . ."  Fed.R.Evid. 703. Plaintiffs believe that the results of tensile bar tests, such as those performed by Merther, constitute data that is reasonably relied upon by experts, such as Rampolla, in the field of metallurgy.  However, Plaintiffs realized that if the Court were to disagree with their position at trial, and exclude the information provided to Rampolla from Merther as hearsay, they would be left without an avenue to introduce the results of the test.  Accordingly, in order to avoid this potential result, and out of an abundance of caution, Plaintiffs identified Merther as an expert witness.[8]

---

[7] *Id.*

[8]   See note 1, *supra*, in which, in an e-mail to Defendants' counsel back in February, Plaintiffs' counsel identified this concern, and stated his reason for identifying Merther therein.  Thus, this is not some sort of after-the-fact justification.

8

Defendants' also apparently believe that it is unnecessary to identify Technician Merther and other similar testing technicians as expert witnesses. In their expert witness disclosure, Defendants only identified three individuals, including metallurgist Michael Stevenson. However, they did not identify any of the technicians who assisted Stevenson as expert witnesses. These technicians included Michael Hayes who prepared a stress analysis relied upon by Stevenson.[9]

## C. Merther Is Qualified to Offer Expert Testimony on the Limited Subject Matter for Which He Was Identified.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Supreme Court held that Rule 702 of the Federal Rules of Evidence compels the district courts to perform the critical "gatekeeping" function concerning the admissibility of expert scientific evidence, 509 U.S. 579, 589 n. 7, 597 [as well[10] as expert technical evidence. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999)]. Expert testimony may be admitted into evidence if:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the

---

[9] See attached billing records for Stevenson, Exhibit "3".

[10] In *Kumbo Tire Co. Ltd. v. Carmichael*, 526 US 137, 147 (1999), the Supreme court held that the courts' gatekeeping function extended to expert technical evidence.

> sort of inquiry mandated in *Daubert*; and
> (3) the testimony assists the trier of fact,
> through the application of scientific,
> technical, or specialized expertise, to
> understand the evidence or to determine a
> fact in issue.

*City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir.1998) (citing *Daubert*, 509 U.S. at 589). Clearly, however, the court's role as gatekeeper "is not intended to supplant the adversary system or the role of the jury." Even if, which is not the case here, the evidence was "shaky," the Eleventh Circuit has made clear that the appropriate mechanisms for ferreting out the truth are "'[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof'" *Allison v. McGhan Medical Group.*, 184 F.3d 1300, 1211-12 (11th Cir. 1999)(quoting *Daubert*, 509 U.S. at 596, 113 S.Ct. 2786). Utilizing similar language, the advisory committee notes to Rule 702 further cautions that the trial judge must avoid usurping the role of the trier of fact. As the notes make plain:

> [T]he rejection of expert testimony is the
> exception rather than the rule. *Daubert* did
> not work a seachange over federal evidence
> law, and the trial court's role as
> gatekeeper is not intended to serve as a
> replacement for the adversary system.
> Vigorous cross-examination, presentation of
> contrary evidence, and careful instruction
> on the burden of proof are the traditional

10

> and appropriate means of attacking shaky but
> admissible evidence. . . likewise this
> amendment is not intended to provide an
> excuse for an automatic challenge to the
> testimony of every expert.

Fed.R.Evid. 702, advisory committee notes, 2000 amendment
(internal citations and quotations omitted).

In this matter, Defendants have not challenged the
qualifications of Peter Merther to conduct the test, or the
methodology that he used. Merther is well qualified to conduct
tensile bar tests.[11] He has a bachelors degree in civil
engineering and is a register professional engineer in the State
of Pennsylvania, the state that the test was administered.
Merther has conducted over 500 tensile tests, and makes sure
that the test machine is calibrated at least once a year in
conformity with ASTM standards. The methodology used by Merther
is consistent with the methodology utilized by testing labs
throughout the country, as set forth above.[12] Consequently, from
the perspective of the *Daubert* criteria, Defendants have raised
no objection that would disqualify Technician Merther from his
conclusion that the test was properly conducted, and the results
were reported to Rampolla. To the extent that the Defendants
have any challenge to the manner and methodology in which the

---

[11] See Merther affidavit, paragraphs 3 to 8.
[12] See Merther affidavit, paragraph 9.

1378858.1

test was conducted, such challenge is appropriately raised upon cross-examination. *See Allison, supra.*

### D. Defendants' Challenge to the Validity of the Tests

The Defendants' sole challenge to Merther's testimony does not, in any way, relate to any opinion which he would be qualified to present under Fed. R. Evid. 702, or under a *Daubert/Kumho* analysis. Rather, Defendants' challenge relates to his opinions and interpretations as to the validity of the tests, which Merther is neither trained, educated nor qualified to render. Unquestionably, any such challenge should be directed at Rampolla, and not Technician Merther. Accordingly, Merther's purported "admissions" as to the validity of the test are of entirely no consequence, whatsoever. Rampolla, as set forth both in his report and affidavit, categorically supports the test results and the validity of the testing.[13] Along these lines, the objections that Defendants assert relating to the validity of the test will be addressed below.

  *a) Defendants contention no. 1: Merther applied the wrong ASTM standard.*

As stated in Merther's affidavit, and as described above, Merther measured the tensile bar, placed the bar in the universal test machine, applied the extensometer, conducted the

---

[13] See affidavit of Brian Rampolla ("Rampolla affidavit"), paragraph 15.

1378858.1

test and recorded the results. The universal testing machinery that he used knows no difference, whatsoever, if the bar is steel or aluminum, and no adjustment, at all, is made on the machines based upon the type of metal tested.[14] True, Merther wrote the steel standard down on his report. However, as Merther sets forth in his affidavit, the ASTM number and the identification of "steel" rather than "aluminum" on the report is of absolutely no consequence to the results of the test, or how it registered on the machine.[15] The Defendants have done nothing to establish otherwise, nor could they. Accordingly, this Court should not, in any way, consider the test "invalid," as suggested by Defendants, simply because Merther wrote incorrect labels on his report.

b) *Defendants contention no. 2: Rampolla failed to notify Defendants of his Intention to Conduct the Test*

This issue is addressed more fully in Plaintiffs' Response to Defendants' Spoliation Motion. Nevertheless, in summary, Rampolla is a pure objective scientist, unaccustomed, as are Defendants' experts, to evaluating metal in the context of litigation.[16] Accordingly, he went about evaluating the metal in

---

[14] See Merther affidavit, paragraph 13. Of course the mechanical properties between steel and aluminum are different, and the individual who evaluated the validity of the test – Rampolla – evaluated them under the correct B557 standard, as set forth in his report.
[15] See Merther affidavit, paragraph 13, 14.
[16] See Rampolla affidavit, paragraph 13A.

13

the manner in which he normally performs his job.[17]
Nevertheless, as his affidavit sets forth, there is more than
sufficient metal in the remaining half of the clevis to perform
the exact type of tensile bar test that Defendants' expert
Stevenson insisted should have been performed. The metal was in
the Defendants' exclusive possession for a period of over four
months, and this Court, in its Order, provided two and a half
months for the Defendants to "test the boat and its component
parts."[18] The Defendants made not the slightest effort to test
the remaining portion of the clevis, even though it has more
than sufficient material to conduct the test in the manner that
they insist it should have been conducted. In fact, the
remaining portion of the clevis, as set forth by the affidavit
of Rampolla, allows as many as four tensile bar specimens of .25
inch in length along the plane of fracture that Stevenson
testified was appropriate.[19] Instead, Defendants prefer to
complain because, although he photographed the clevis and

---

[17] See Deposition of Brian Rampolla at p. 149 to p. 150.

[18] See Order, dated March 6, 2007, paragraph (3). Exhibit "4".

[19] See Rampolla affidavit at paragraph 13C. Although not part of Defendants'
motion, Stevenson criticized Rampolla for not conducting a tensile bar test
along a plane that would be perpendicular to the fracture surface, which
would make the fracture surface of the tensile bar parallel to the fracture
surface of the housing. See Stevenson report at p. 10 to p. 11 and Stevenson
depo at p. 110. To the extent Stevenson believes that this was the
appropriate manner of conducting the test, four additional tensile bars could
have been extracted from the remaining portion of the clevis – to conduct the
test the way he believes was appropriate. Instead, Stevenson chose to simply
criticize Rampolla's test rather than conduct a test of his own.

14

identified where he intended to cut and preserved all of the pieces for Defendants to review and evaluate, Plaintiffs' expert did not conduct his test in their presence. This argument is disingenuous at best.

    *c)*   *Defendants contention no. 3: The tensile bar was the wrong size.*

As noted by Rampolla in his original report, Rampolla wished to retrieve a specimen, and test, at the closest place possible to the fracture surface of both the clevis and the ring. Although the evidence demonstrates, even independent of his testimony, that he hoped to retrieve a .25 inch tensile bar,[20] only enough material was available to prepare a .16 inch tensile bar.[21] Because it was important to Rampolla to be able to compare the mechanical properties of the ring with those of the housing, he selected the smaller, .16 tensile bar.[22] Accordingly, Rampolla had the testing group retrieve a .16 inch tensile bar, which was the largest that he could retrieve that would reflect the mechanical properties of both the clevis' and the ring's fracture surfaces.[23]

Nevertheless, in order to make an appropriate comparison, and evaluate if the size of the tensile bar would render the

---

[20] See Rampolla Report at E-1. See Rampolla's Notes attached as Exhibit "2".
[21] *Id.*
[22] See Rampolla affidavit at paragraph 13B.
[23] See Rampolla Report at E1.

1378858.1

test invalid, he made sure that he tested two specimens from the housing of the same size. He then compared them to two specimens of the gimbal ring[24] to make sure that the results were not contaminated by the size or by the existence of porosity. As set forth in Rampolla's affidavit,[25] the ring exhibited mechanical properties roughly equivalent to its specification (the A357 alloy), where the housing (the clevis) at issue did not. By the same token, the housing tensile bar, although exhibiting different degrees of porosity (one had three pores and the other had five) exhibited roughly the same lack of tensile strength. Accordingly, Rampolla was able to rule out either the size of the bar, or the amount of porosity, as effecting the lack of ductility of the housing's tensile bar.[26]

In examining the fracture surface of the bars through a scanning electron microscope, he was able to observe a high

---

[24] Although the ring is made of a different alloy A357 rather than 360, and is made from a permanent mold casting rather than high pressure die casting, the same standard - B557 -applies to both, and the same category - "castings"- applies to both as well.   Thus, if the test accurately reflected the mechanical properties of the ring, which it did, it should also reflect the mechanical properties of the housing.   Both sets of tensile bars were consistent with the fracture surfaces of the respective materials, and the ring tensile bars also reflected the anticipated (specification) mechanical properties of the metal.   By contrast, although the fracture surface of the tensile bars were consistent with the fracture surface of the clevis, both of which showed no ductility, the tensile bar test showed a deviation from the mechanical specifications of Mercury's specifications, which was consistent with the evidence on the fracture surface; thus confirming the validity of the test.

[25] See Rampolla affidavit, paragraphs 13, 15.

[26] See Rampolla affidavit, paragraphs 13, 15.

16

concentration of beta phase platelets.  This concentration of beta phase platelets on the tensile bar, as admitted by defense expert Stevenson,[27] was similar to that of the fracture surface of the housing (clevis) itself.  The housing's tensile bar fracture surface also exhibited no evidence of ductile dimples or any other indication of ductility, corresponding precisely to the fracture surface of the housing clevis as well.[28]  Thus, Rampolla was able to conclude that the results of the tensile bar test were valid reflections of the mechanical properties of the housing's clevis in the area of its fracture.

 d)  *Defendants contention no. 4:  The tensile bar had porosity.*

As admitted by Defense expert Stevenson, and as readily observable in the standard itself, nowhere in B557 is the tensile bar test invalidated because of porosity.[29]  Stevenson's testimony and Defendants' motion raise concerns relating to porosity based upon the size of the tensile specimen, which is addressed above.  Furthermore, as referenced in Rampolla's affidavit, the presence of differing amounts of porosity in the

---

[27] See Stevenson depo at p.149 to p. 150.
[28] See Rampolla Report at p. 6. In the unlikely event that this Court excludes Merther's testimony relating to the result that the computer registered, it should not, in any way, prohibit Rampolla from testifying as to his visual and microscopic examination and comparison of the fracture surfaces of the respective tensile bars.
[29] In fact, section 8.2 of B557 specifically states that porosity, among other discontinuities, is *not* a reason for a replacement tensile bar.

17

tensile bars is not relevant to evaluating the validity of these tests, in that the embrittlement is so extensive that porosity could not have effected the complete lack of ductility in the material.[30]

In their memorandum, Defendants wish to transform Technician Merther into an "expert" on the rationale behind the ASTM standards, particularly relating to the rationale behind concern over priority.[31] This laboratory technician, however, is not even remotely qualified to tender an opinion in this regard, and has never been offered for that purpose. Certainly, if Plaintiffs had tendered Merther as an expert on the ASTM standards, Plaintiffs would be facing an aggressive *Daubert* motion from the Defendants, accurately arguing that it is far outside of the scope of Merther's qualifications. Indeed, the Defendants, have never tendered a mechanical engineer to offer an opinion on the validity of the tensile bar test in this case.[32] Instead, like Plaintiffs, they are relying upon a metallurgist to evaluate the validity of the results.[33] A metallurgist – not a technician in a testing lab – is the

---

[30] See Rampolla affidavit, paragraph 15.

[31] See Defendants' Merther Motion and Memorandum at pp. 16-17.

[32] If, in fact, a mechanical engineer is the proper discipline to evaluate the test, which it isn't, Defendants' attempt to disqualify Merther fails in that they have not offered a mechanical engineer or lab technician of their own to render an opinion that the test is not valid.

[33] See deposition of Michael Stevenson at p. 81 to p. 88.

18

appropriate individual to offer an opinion on the validity of the test.

    e)    *Defense contention no. 5: The results of the test are invalid because they displayed that the bar fractured before it was able to record a yield strength, and exhibited no elongation.*

This argument, made by the defense, reflects Mercury's corporate arrogance and insistence that, because the tensile bar test confirmed that the metal is so defective that it could not even withstand enough load to meet and surpass yield strength, there must be something wrong with the **test** – not the **metal**. As Defendants state in their Memorandum, "properly administered tensile testime of HPDCA will always show some level of yield strength before fracture."[34]  The critical concept omitted by this statement is the fact that **properly made**  *metal*, that meets the specifications set forth by industry standards and manufacturer's specifications  *will*  exhibit those characteristics. It is precisely because the metal in **this** case did **not** meet those characteristics, which was established through microfractographic examination of the fracture surfaces of the materials involved and confirmed by the tensile bar tests, that the gimbal housing in this case failed.

---

[34] See Defendants' Merther Motion and Memorandum at p. 21.

19

To the extent that the standard cited by the Defense 7.8.2 suggests that the test should be discarded and a replacement test conducted "as allowed in 8.1," this standard comes completely within the section – section 7.8 – identified with "elongation."[35]   As set forth in Rampolla's report, and as acknowledged by Stevenson, Rampolla specifically did not consider the test results for the purpose of evaluating elongation.[36]   Moreover, even section 8.1, as admitted by Stephenson, makes retesting discretionary with the tester, and not mandatory. Furthermore, section 8.2 of the standard states that the test should **not** necessarily be discarded if discontinuities such as cracks, ruptures, flakes and porosity are revealed in the fracture that are considered indicative of inferior or defective material.[37]   Thus, in light of the fact that Rampolla never considered the results of the test for the purpose addressed by this section (elongation), citation of this provision is simply another red herring.

   **E.    Any Perceived Deviation from ASTM Standards Go to the Weight, not Admissibility of the Evidence**

---

[35] See ASTM B557, Exhibit "5". See Stevenson depo at p. 107.
[36] See Stevenson depo at p. 107 to p. 108. See Rampolla Report at E-1.
[37] As previously noted, both beta phase platelets ("flakes") and porosity, which is associated, along with shrinkage, with excessive beta phase platelets, were present in this material.

1378858.1

To the extent Defendants attack the results of the tensile bar test, they do so entirely in the context of Rampolla's (and, from their perspective, Merther's) alleged failure to comply with standards promulgated by the American Society for Testing and Materials (ASTM). The ASTM, a voluntary standards development organization, is well respected in the scientific community. Nevertheless, although their standards provide guidelines to practitioners in the field, they have never been adopted by either the state of Georgia or a federal legislative body, and have no force of law in the Georgia or in federal courts. Rather, the appropriate consideration, when evaluating the admissibility of this testimony, is the federal Rules of Evidence, particularly Fed. R. Evid. 401, 402 and 403 as well as 702 and 703.

Clearly, the results of the tensile bar testing are highly corroborative of Rampolla's microscopic examination of the clevis' microstructure and are relevant to Plaintiffs' position that the ductility of the metal fell far below what was required by Mercury's specification and industry standards. To the extent that there is any perceived "prejudice" to the defense by any alleged deviation from those standards, such prejudice can adequately be explored by cross-examination of Plaintiffs' experts and technicians. Accordingly, to the extent that

21

Defendants, in their motion, itemize the deficiencies that they perceive with the manner in which the test was conducted or interpreted, this should not prevent admissibility, but, rather, should go to the weight of evidence. *See Allison, supra.*

## IV. Conclusion

For the foregoing reasons, Defendants' Motion to Exclude the Expert Testimony of Peter Merther should be denied in its entirety.

## LR 5.1B CERTIFICATION

Plaintiffs' counsel hereby certifies that this Response has been prepared with Courier New 12 point font, double-spaced, with a top margin of not less of 1.5 inches and a left margin of not less than 1 inch., which is approved by the Court in LR 5.1B.

Dated:  July 10, 2007

Fredric S. Zinober, Esq.
(Florida Bar No. 0341657)
Nathan M. Berman, Esq.
(Florida Bar No. 0329230)
ZUCKERMAN SPAEDER LLP
101 E. Kennedy Boulevard
Suite 1200
Tampa, FL  33602
Ph: 813.221.1010
Fax: 813.223-7961

1378858.1

Barry Goodman, Esquire
Georgia Bar No. 300880
GOODMAN & GOODMAN, LLP
6445 Powers Ferry Road, N.W.,
Suite 265
Atlanta, Georgia 30339
Ph: 770.952.0400; Fax 770.952.3358

Michael Allweiss, Esquire
(Florida Bar No. 0775207)
ALLWEISS & ALLWEISS
One Progress Plaza, Suite 810
St. Petersburg, Florida  33701
Ph: 727.827.4944; Fax 727.827.4942

Attorneys for Plaintiffs PETER
GAFF, as  Administrator of the
Estate of Michael K. Maldonado,
and JESSICA MALDONADO

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

PETER GAFF, as Administrator of the
Estate of Michael K. Maldonado,
JESSICA MALDONADO,

      Plaintiffs,              CASE NO. 2 06-CV-0068-
      WCO

v.

BAJA MARINE CORPORATION, and
BRUNSWICK CORPORATION,

      Defendants.
_____/

## CERTIFICATE OF SERVICE

I hereby certify that on July 10, 2007, I served upon opposing counsel, via electronic mail at the addresses listed below, copies of Plaintiffs' Response to Defendants' Motion to Exclude the Expert Testimony of John P. Merther, P.E. and electronically filed a Certificate of Service for Plaintiffs' Response to Defendants' Motion to Exclude the Expert Testimony of John P. Merther, P.E. with the Clerk of the Court using the CM/ECF system which will automatically send email notification of such filing to the following attorneys of record:

1378858.1

Douglas G. Scribner, Esq.
Rodney J. Ganske, Esq.
Alston & Bird LLP
1201 West Peachtree Street
Atlanta, Georgia 30309

Fredric S. Zinober, Esq.
Nathan M. Berman, Esq.
Zuckerman Spaeder, LLP
101 E. Kennedy Blvd.
Suite 1200
Tampa, Florida 33602

Michael Allweiss, Esq.
Allweiss & Allweiss
One Progress Plaza
Suite 810
St. Petersburg, Florida 33701

Barry Goodman, Esq.
Goodman & Goodman, LLP
6445 Powers Ferry Road, N.W.
   Suite 265
Atlanta, Georgia 30339

s/ Nathan M. Berman, Esq.
Nathan M. Berman, Esq.
(Florida Bar No. 0329230)
ZUCKERMAN SPAEDER LLP
101 E. Kennedy Boulevard
Suite 1200
Tampa, FL  33602
Ph: 813.221.1010
Fax: 813.223-7961
Attorneys for Plaintiffs PETER
GAFF, as Administrator of the
Estate of Michael K. Maldonado,
and JESSICA MALDONADO

1378858.1